IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
WICHITA FALLS DIVISION

| | | |
|---|---|---|
| EAGLE OIL & GAS CO. et al., | § | |
| | § | |
| **Plaintiffs,** | § | |
| | § | |
| v. | § | Civil Action No. 7:12-cv-00133-O |
| | § | |
| TRAVELERS PROPERTY CASUALTY | § | |
| COMPANY OF AMERICA et al., | § | |
| | § | |
| **Defendants.** | § | |
| | § | |

## MEMORANDUM OPINION AND ORDER

Before the Court are: Plaintiffs' Motion for Partial Summary Judgment, filed April 14, 2014 (ECF No. 107); Motion for Summary Judgment of Travelers Property Casualty Company of America and St. Paul Surplus Lines Insurance Company, filed April 14, 2014 (ECF No. 113); and Motion for Summary Judgment of York Risk Services Group, Inc., filed April 14, 2014 (ECF No. 115). Having considered the motions, responses, replies, record, and applicable law, and for the reasons that follow, the Court grants in part and denies in part Plaintiffs' Motion for Partial Summary Judgment and Motion for Summary Judgment of Travelers Property Casualty Company of America and St. Paul Surplus Lines Insurance Company, and grants Motion for Summary Judgment of York Risk

Services Group, Inc.[1]   Also pending is Defendants' Motion to Bifurcate Trial of the Extra-Contractual Claims, filed April 14, 2014 (ECF No. 118), which the Court denies as moot.

## I.      Factual and Procedural Background[2]

This is an insurance coverage dispute between policyholder plaintiffs and their insurer under a well-control policy following a September 22, 2011 well blowout in Reeves County, Texas.  The lawsuit arises out of a claim under Control of Well Policy Number VI04200283 (the "policy") issued by Defendant Travelers Property Casualty Company of America ("Travelers") to Plaintiff Eagle Oil & Gas Company ("Eagle Oil") with effective dates of June 10, 2011 to June 10, 2012.  Among other things, the policy provided protection to the insured against oil well blowouts, and reimbursement for expenses incurred in bringing the well under control.

Pursuant to a Joint Operating Agreement ("JOA"), Eagle Oil was the operator and a working-interest owner in the Monroe 39 #2H Well (the "Well").  Plaintiffs Eagle Wolfbone Energy Partners, LP ("Eagle Wolfbone"), and Eagle Oil & Gas Partners, LLC ("Eagle Partners") were non-operating working-interest owners in the Well and were additional insureds under the Travelers policy.  *See* Appendix for Brief in Support of Pl. Summ. J. Motion ("Pl. SJ App.") at 205-63, ECF Nos. 109-110.

On September 22, 2011, while Eagle Oil was attempting to open a stuck frac port sleeve by applying various levels of pressure, a 7-inch piece of casing ruptured downhole in the Well, causing

---

[1]Also before the Court are Defendants' Motion to Strike Plaintiffs' Summary Judgment Evidence, filed May 5, 2014 (ECF No. 127), and Defendants' Second Motion to Strike Plaintiffs' Summary Judgment Evidence, filed May 19, 2014 (ECF No. 139).  In ruling on the pending summary judgment motions, the Court has either not relied on evidence to which Defendants object, or, where it has, consideration of Plaintiffs' proffered evidence has not altered the Court's decision in favor of Defendants.  Accordingly, Defendants' Motions to Strike (ECF Nos. 127 and 139) are denied as moot, and Defendants' evidentiary objections are overruled as moot.

[2]In setting forth the facts, the Court applies the summary judgment standard set forth below in Section II.  The material facts are undisputed except as otherwise noted.

the top casing joints and wellhead to be ejected into the air, and allowing a flow of gas and well fluids to the surface that could not be controlled. *See* Appendix of Exhibits to Briefs in Support of Def. Summ. J. Motions ("Def. SJ App.") at 55-57, 63, 245, 251-52, ECF No. 117.   The parties dispute whether the 7-inch casing broke apart because Eagle Oil exceeded the maximum allowable casing pressure for this operation. *Id.* at 34-35, 55-57; Pl. SJ App. at 580, 885-60.   Because of the uncontrolled flow of gas and well fluids to the surface, the Well was "out of control," as that term is defined in the policy, giving rise to Plaintiffs' claims for coverage. Pl. SJ App. at 165, 169.   Wild Well Control was dispatched to the location and began removing equipment to gain access to the Well. Def. SJ App. at 11.   To contain the flow, Plaintiffs constructed additional pits and the runoff was hauled away by trucks. Cleanup and snubbing operations continued through October 2011. *Id.* at 13. Plaintiffs later plugged and abandoned the Well, and ultimately redrilled the Monroe 39 #2R replacement well.   Plaintiffs incurred costs and expenses: (1) in attempting to regain control of the Well, including plugging and abandonment ("P&A") costs; (2) in redrilling a replacement well; (3) in cleaning up pollution resulting from the blowout; and (4) in regard to oil field equipment owned by others that was damaged.   Plaintiffs gave proper notice and submitted their losses to Travelers for reimbursement under the policy. *Id.* at 164.

Acting through internal adjuster, Paul Zatopek (and later Dale Reed), Travelers assigned BC Johnson Associates ("BC Johnson") as independent energy loss adjusters to investigate the claims. BC Johnson is a trade name of Defendant York Risk Services Group ("York"). *See* Def. Answer & Affirmative Defenses ¶ 14, ECF No. 71.   On October 11, 2011, BC Johnson issued its preliminary report to Travelers, finding Eagle Oil may have violated the policy's "due care and diligence" clause during the fracturing job, either by using too much pressure causing the 7-inch casing to separate,

3

or by failing to attach the wellhead to the Well's 13-3/8 inch casing rather than the 9-5/8 inch casing. Def. SJ App. at 1-39.  Travelers then hired Greg Sones ("Sones'), a petroleum engineer, to further review information regarding the cause and/or nature of the well control incident.  *Id.* at 308-10. Sones ultimately concluded that the cause of the blowout was Eagle Oil's use of excessive pressure on the 7-inch casing which caused the casing to fail, and the blowout to occur  *Id.* at 318-24, 327, 343-44.

On July 5, 2012, relying on Sones's report,Travelers denied coverage to Eagle Oil and Eagle Wolfbone on their control of well (including P&A), redrill, pollution cleanup, and care, custody and control claims on the grounds that Eagle Oil's engineering decision to exceed maximum safe fracturing pressure violated the "due care and diligence" clause in the policy.  *Id.* at 228-30; Pl. SJ App. at 707, 713, 714.  The July 5, 2012 denial of coverage letter stated in relevant part:

> Despite the planned limitation of the wellbore pressure, Eagle elected to exert higher pressure on the 7-inch casing and it appears that this higher pressure caused the failure of the casing and the blowout ensued . . .  Travelers views the repeated pressure excursions far in excess of the designed pressure tolerances . . . as a failure to exercise due care and diligence in the conduct of the frac job.  For that reason, Travelers is denying Eagle's claim.

Def. SJ App. at 229.

Travelers denied coverage for P&A and redrill costs on the additional basis that the policy did not cover these claims because the Well was lost due to the pressure operation and not from any unintended and uncontrolled flow that followed the breaking of the casing.  *See id.* at 228-30.  As stated in the July 5, 2012 denial of coverage letter:

> There is an additional coverage issue with respect to the P&A and redrill portions of Eagle's claim.  Well control coverage under Section 1A of the Policy is for expenses "as a direct result of" the well getting out of control.  Similarly, redrill coverage is afforded under Section 1B of the Policy where redrill expense was incurred "as a

4

result of" a well control incident.  In this instance, it appears that the necessity of P&A and redrill was due to the parting of the casing, and not due to the well control event.  Significantly, the casing parted before — not as a result of — the blowout.  Therefore, even without the due diligence issue referenced herein, there would be no coverage for P&A or redrill expenses that resulted from the parted casing.

*Id.*

On July 9, 2012, Eagle Oil and Eagle Wolfbone filed this case in the 30th Judicial District Court of Wichita County, Texas against Travelers alleging, among other things, that Travelers breached the policy by denying coverage.  Travelers removed the action to this Court.  Eagle Oil and Eagle Wolfbone subsequently amended their pleadings to add as additional Plaintiffs non-operating working-interest owners Eagle Partners, Riverford Exploration, LLC ("Riverford"), and Wolverine Oil and Gas Corp. ("Wolverine"), and to add as additional Defendants both St. Paul Surplus Lines Insurance Company ("St. Paul"), which issued a similar control of well policy to Wolverine, and independent energy loss adjuster York (in place of improperly designated Defendant OCB Interests, LLC d/b/a BC Johnson Associates).

The live pleading is Plaintiffs' Third Amended Complaint where Plaintiffs sue Defendants Travelers and St. Paul for: (1) breach of contract for denial of claim coverage under the policy, (2) breach of the common law duty of good faith and fair dealing, (3) violations of sections 541 and 542 of the Texas Insurance Code, and (4) violations of section 17.46(b) of the Texas Deceptive Trade Practices Act ("DTPA") and resultant penalties.  *See* Pl. Third Am. Compl. ¶¶ 29(a) - 31(b), ECF No. 68.[3]  Plaintiffs also sue York for common law and statutory bad faith under Texas Insurance

---

[3]Though Travelers disputes that Plaintiffs have included a claim for breach of contract based on denial of coverage for care, custody and control, read liberally, the Court finds that the live pleading is broad enough to encompass such a claim.  *See* Pl. Third Am. Compl., ECF No. 68.

Code sections 541 and 542, and related DTPA provisions, in connection with its loss adjusting services. *See id.* ¶¶ 32(a) - 32(b). Plaintiffs seek actual damages, exemplary damages, treble damages under the Texas Insurance Code, as well as interest, costs, and attorney's fees. *See id.* ¶ 34. Defendants live pleading is Defendants' Answer and Affirmative Defenses to Plaintiffs' Third Amended Complaint, in which Defendants assert forty-two affirmative defenses, including that "[t]here is no coverage under the policies because the claimed expenses arise from a blowout caused, in whole or in part, by Plaintiffs' breach of the policy's Due Diligence and Warranties condition[]"; "[t]here is no Section IA Control of Well Insurance coverage for plugging and abandonment expenses because they are not a direct result of the well getting out of control[]"; and "[t]here is no Section IB Redrill/Extra Expense coverage for redrill expense because the well was lost or damaged as a result of a casing failure and not as a result of a Section IA well control incident." *See* Def. Aff. Defenses Nos. 7-9, ECF No. 71.

On June 30, 2014, pursuant to a joint stipulation of dismissal, the Court dismissed Plaintiffs Wolverine and Riverford's claims against Defendants with prejudice, and dismissed Wolverine, Riverford and Defendant St. Paul as parties from this lawsuit. *See* Rule 54(b) Partial Final Judg. & Order of Dismissal, ECF No. 180. Accordingly, the remaining parties are Plaintiffs Eagle Oil, Eagle Wolfbone, and Eagle Partners (hereinafter "Plaintiffs") and Defendants Travelers and York.[4]

---

[4]Plaintiffs initially also sued petroleum engineer Greg Sones, alleging violations of the Texas Insurance Code and related DTPA provisions. On November 8, 2013, the Court granted Sones' motion for summary judgment and dismissed him as a party, finding he was not a "person . . . engaged in the practice of insurance." *See* Mem. Op. & Ord. at 5, ECF No. 96.

6

Plaintiffs and Travelers have each filed a motion for partial summary judgment in this coverage dispute.  York has filed a motion for summary judgment.  The pending motions have been fully briefed and are ripe for adjudication.

## II.     Applicable Legal Standards

### A.      Summary Judgment

Summary judgment is proper when the pleadings and evidence on file show that no genuine issue exists as to any material fact and that the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(c).  "[T]he substantive law will identify which facts are material." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).  A genuine issue of material fact exists "if the evidence is such that a reasonable jury could return a verdict for the non-moving party." *Id.*  The movant makes a showing that there is no genuine issue of material fact by informing the court of the basis of its motion and by identifying the portions of the record that reveal there are no genuine material fact issues. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986); Fed. R. Civ. P. 56(c).

Once the movant makes this showing, the non-movant must then direct the court's attention to evidence in the record sufficient to establish that there is a genuine issue of material fact for trial. *Celotex*, 477 U.S. at 323–24.  To carry this burden, the "opponent must do more than simply show . . . some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986).  Instead, the non-movant must show that the evidence is sufficient to support a resolution of the factual issue in his favor. *Anderson*, 477 U.S. at 249. Neither conclusory allegations nor unsubstantiated assertions will satisfy the non-movant's summary judgment burden. *Little v. Liquid Air Corp.*, 37 F.3d 1069, 1075 (5th Cir. 1994) (en banc); *Topalian v. Ehrman*, 954 F.2d 1125, 1131 (5th Cir. 1992).  The party opposing summary judgment is required

to identify specific evidence in the record and to articulate the precise manner in which that evidence supports his claim. *Ragas v. Tenn. Gas Pipeline Co.*, 136 F.3d 455, 458 (5th Cir. 1998).

When weighing the evidence on a motion for summary judgment, the court must decide all reasonable doubts and draw all reasonable inferences in favor of the non-movant. *See Walker v. Sears, Roebuck & Co.*, 853 F.2d 355, 358 (5th Cir. 1988). The court cannot make a credibility determination in light of conflicting evidence or competing inferences. *Anderson*, 477 U.S. at 255. As long as there appears to be some support for the disputed allegations such that "reasonable minds could differ as to the import of the evidence," the motion for summary judgment must be denied. *Id.* at 250.

## B.    Contract Construction

State law rules of contract construction govern in diversity cases such as this one. *Amica Mut. Ins. Co. v. Moak,* 55 F.3d 1093, 1095 (5th Cir. 1995). In Texas, insurance contracts are subject to normal rules of contract construction. *Carrizales v. State Farm Lloyds*, 518 F.3d 343, 345-46 (5th Cir. 2008) (citing *Nat'l Union Fire Ins. Co. v. CBI Indus., Inc.*, 907 S.W.2d 517, 520 (Tex. 1995)); *Barnett v. Aetna Life Ins. Co.*, 723 S.W.2d 663, 665 (Tex. 1987). Texas courts construe the language according to "the ordinary, everyday meaning of the words to the general public." *Fiess v. State Farm Lloyds*, 202 S.W.3d 744, 746 (Tex. 2006). The focus of construction is to ascertain the parties' intent as expressed in the policy. *CBI Indus.*, 907 S.W.2d at 520.

The determination whether a contract term is ambiguous is a matter of law. *D.E.W., Inc. v. Local 93, Laborers' Int'l Union,* 957 F.2d 196, 199 (5th Cir. 1992). A term is ambiguous only if it is susceptible to more than one reasonable meaning, and mere disagreement between the parties about the correct interpretation of the term will neither render it ambiguous nor transform the issue

of law into one of fact.  *Id.*  The court will not strain to find an ambiguity where none exists.  *Ramsay v. Md. Am. Gen. Ins. Co.,* 533 S.W.2d 344, 346 (Tex.1976).  If the contract is subject to a "certain or definite legal meaning or interpretation," it is not ambiguous, and the court will construe its meaning as a matter of law. *Coker v. Coker,* 650 S.W.2d 391, 393 (Tex. 1983).

Unlike other contracts where ambiguous language creates a fact question, insurance policies are analyzed with a presumption in favor of coverage. *State Farm Fire & Cas. Co. v. Reed,* 873 S.W.2d 698, 701 (Tex. 1993). When a policy term is ambiguous, the court will construe the term in favor of the insured. *Toops v. Gulf Coast Marine Inc.*, 72 F.3d 483, 486 (5th Cir. 1996) (quoting *Adams v. John Hancock Mut. Life Ins. Co.,* 797 F. Supp. 563, 567 (W.D.Tex. 1992)). When construing a policy term that excludes or limits coverage, a court must adopt any reasonable interpretation of the exclusion urged by the insured, even if the interpretation provided by the insurer appears more reasonable or a more accurate reflection of the parties' intent.  *Id.*  These rules of construction only apply, however, when the terms of the policy are ambiguous. *Ranger Ins. Co. v. Bowie,* 574 S.W.2d 540, 542 (Tex. 1978).

The insured first bears the burden of proving that a loss is encompassed by the basic coverage terms of the relevant policy; if it is, the insurer may then demonstrate the applicability of an exclusion to coverage.  *Fiess v. State Farm Lloyds*, 392 F.3d 802, 807 (5th Cir. 2004).

### III.   Analysis of Plaintiffs' Motion for Partial Summary Judgment & Travelers' Cross-Motion for Partial Summary Judgment on Redrill Costs

Plaintiffs have moved for entry of partial summary judgment on the following grounds:

(1) The due care and diligence clause is a covenant to insurers which can be enforced through an exclusion — it is not a condition precedent;

9

(2) The phrase "due care and diligence" is ambiguous; the Court should therefore adopt the insured's interpretation that "due care and diligence" means "gross negligence," and dismiss Traveler's due diligence defense due to lack of evidentiary support;

(3) Eagle Plaintiffs are owed coverage by Travelers on their policy claims for control of well costs, including P&A costs (Section IA), redrill costs (Section IB); pollution cleanup costs (Section IC); and care, custody and control costs (Section ID), with the amount of damages to be proven at trial; and

(4) Defendants' Affirmative Defenses Numbers 18, 22, 25, 27, 31, 37 and 41 should be dismissed, as there is no evidence to support these affirmative defenses.[5]

*See* Pl. Mot. for Partial Summ. J. (ECF No. 107) and Brief in Support (ECF No. 108). Travelers opposes Plaintiffs' motion, and has also filed a cross-motion for partial summary judgment on Plaintiffs' breach of contract claim arising from Traveler's denial of coverage for redrill costs, and on Plaintiffs' extra-contractual claims. *See* Def. Mot. for Partial Summ. J. (ECF No. 113) and Brief in Support (ECF No. 114).[6] Defendant York has moved for summary judgment on all Plaintiffs' claims, which include a statutory bad faith claim under Texas Insurance Code sections 541 and 542, and related DTPA provisions, in connection with its loss adjusting services on behalf of Travelers. *See* York Mot. for Summ. J. (ECF No. 115) and Brief in Support (ECF No. 116).

The motions are fully briefed. The Court now turns to the scope of coverage under the policy, and to those disputed policy provisions which underlie much of this litigation.

---

[5]Plaintiffs initially also sought dismissal of affirmative defenses number 1, 3, 6, 11, 23, 26 and 38. Travelers has voluntarily withdrawn these affirmative defenses mooting the issue. *See* Def. Resp. to Pl. Mot. for Partial Summ. J. at 36, ECF No. 132.

[6]The Court will address the parties' cross-motions on redrill coverage together. In the context of the cross-motions, the Court will construe the evidence favorably to the party against whom summary judgment is being entered. *See, e.g., Trugreen Landcare, L.L.C. v. Scott*, 512 F. Supp. 2d 613, 617 n.2 (N.D. Tex. 2007) (Fitzwater, J.) (reviewing summary judgment evidence in context of cross-motions for summary judgement). Travelers also seeks summary judgment on Plaintiffs' extra-contractual claims, which the Court will address in a separate section of this decision. *See infra* Part III.D.

### A.     Coverage of the Subject Control of Well Policy

"In the insular world of oil and gas well-drilling insurance, determining the breadth of, and liability for, insurance coverage begins with an analysis of the policy language." *Atlantic Richfield Co. v. Underwriters at Lloyd's London*, 398 F. Supp. 708, 713 (S.D. Tex. 1975).

The policy provides control of well insurance and covers costs related to loss of control of a well.   There are four main policy coverage sections: Section IA (Control of Well); Section IB (Redrill/Extra Expense); Section IC (Pollution and Cleanup); and Section ID (Care, Custody and Control).   Def. SJ App. at 110-14.   Section IA reimburses the insured for actual costs and/or expenses reasonably incurred to regain or attempt to regain control of any "well insured" which becomes a well which cannot be controlled.   *Id.* at 110.   Coverage under Section 1B reimburses the insured for expenses reasonably incurred to restore or redrill a well that has been lost or otherwise damaged as a result of an "occurrence" that gives rise to a claim which would be recoverable under Section IA of the policy.   *Id.* at 112-14.   Section IC indemnifies the insured for the cost of pollution cleanup, provided the pollution results from an "occurrence" that, among other requirements, gives rise to a claim which would be recoverable under Section IA of the policy.   *Id.*   Section ID indemnifies the insured for physical loss or damage to, or salvage costs of, oil field equipment damaged as a result of an "occurrence" that gives rise to a claim which would be recoverable under Section 1A of the policy.   *Id.* at 114-15.   `

To reiterate, Travelers denied all Plaintiffs' claims for policy coverage due to Plaintiffs' alleged violation of the "due care and diligence" provision in the policy.   Pl. SJ App. at 707, 713, 714; Def. SJ App. at 228-230.   With regard to Plaintiffs' P&A and redrill costs, Travelers also based its denial on its contention that the Well was lost due to "the parting of the casing, and not due to the

well control event." Pl. SJ App. at 118; *see also* Def. SJ App. at 228-230. The Court now turns to the disputed policy provisions and the parties' respective legal arguments regarding the proper interpretation of the provisions.

### B.      Disputed Policy Provisions

### 1.      The "Due Care and Diligence" Clause

Plaintiffs do not dispute the validity of the "due care and diligence" clause of the policy. Rather, Plaintiffs' summary judgment motion pertains solely to which party bears the burden of establishing compliance with the clause. In denying coverage, Travelers placed the burden on Plaintiffs. *See* Def. SJ App. at 228-30. Plaintiffs now seek summary judgment that the burden of proving lack of compliance with the "due care and diligence" clause rests with Travelers.

Common Conditions, Section I, subsection 5.c of the policy reads as follows:

### 5.      EXCLUSIONS

There shall be no indemnity of liability under this Section I for:

***

    **c.**    Any claim arising out of any "occurrence" caused, in whole or in part, by any breach of any condition or warranty set forth in Paragraph 6. DUE DILIGENCE AND WARRANTIES below;

Pl. SJ App. at 33. Common Conditions, Section I, subsection 6.a of the policy reads as follows:

### 6.      DUE DILIGENCE AND WARRANTIES

    **a.**    It is a condition that the Insured must exercise due care and diligence in the conduct of all operations with respect to any "well insured", and by utilizing all safety practices and equipment generally considered prudent for such operations. If any hazardous condition develops with respect to a "well insured", the insured must at its sole expense make all

12

> reasonable efforts to prevent loss, damage, cost or expense insured under this Policy.

*Id.*

### a.      Summary of Parties' Arguments on Due Care and Diligence Clause

Plaintiffs "maintain that the 'due care and diligence' clause is a covenant made to Travelers to act in a certain manner while conducting well-related activities, and compliance with that covenant is enforced by the policy's Common Condition 5.c which excludes coverage for breach of the covenant; because the enforcing agent is an exclusion, Travelers would bear the burden of proving Eagle Plaintiffs failed to act with 'due care and diligence.'"  *See* Pl. Brief in Supp. of Mot. for Partial Summ. J. at 8, ECF No. 108.  Alternatively, Plaintiffs argue that while each subsection (5.c and 6.a) is unambiguous on its face, read together in the context of the entire policy, an ambiguity arises.  *See id.* at 15.  Therefore, Plaintiffs argue, the burden of proof would shift to the insurer to prove an exclusion to avoid coverage.  *Id.*

Pointing to the plain language of the policy, Travelers opposes both Plaintiffs' primary and alternative argument.  First, Travelers contends that "the plain wording [of the clause] defeats Eagle's contention that the clause is a covenant and not an enforceable condition precedent to coverage."  *See* Def. Brief in Resp. to Pl. Mot. for Partial Summ. J. at 5-6, ECF No. 132.  In support, Travelers states:

> The Due Diligence clause is in the Common Conditions [section of the policy] and the Conditions state that "All Sections [] are subject to the following conditions." That means coverage under Sections IA-Control of Well, IB-Redrill/Extra Expense, IC-Pollution and Clean Up, and ID-Care, Custody, and Control is condition[ed] upon compliance with the Due Diligence requirements.  The Due Diligence clause expressly states that "it is a condition that" the insured must undertake a certain standard of care in the conduct of its operations.  A material breach [of] the condition relieves Travelers from liability under the policy.

*Id.* at 4.   Second, Travelers rejects Plaintiffs' contention that an ambiguity arises when subsection 5.c and 6.a are read together, asserting: "The Due Diligence clause appears in the Conditions Section and expressly states it is a condition in its wording.   Texas law is clear that the insured bears the burden of proving all conditions precedent to coverage, regardless of the location of the enforcement clause."   *Id.* at 7 (citations omitted).

### b.    *Discussion*

### i.    *Covenant or Condition Precedent?*

A condition precedent is an event that must happen or be performed before a right can accrue to enforce an obligation.   *Centex Corp. v. Dalton*, 840 S.W.2d 952, 956 (Tex. 1992).   The burden of proof is on the plaintiff to prove that a condition precedent has been satisfied.   *Trevino v. Allstate Ins. Co.*, 651 S.W.2d 8, 12 (Tex. App.—Dallas, 1983, writ ref'd n.r.e.).   Terms such as "if," "provided that," "on condition that," or another phrase that conditions performance, "usually connote[] an intent for a condition rather than a promise."   *Hohenberg Bros. Co. v. George E. Gibbons & Co.*, 537 S.W.2d 1, 3 (Tex. 1976).   However, "where the intent of the parties is doubtful or where the condition would impose an absured [sic] or impossible result[,] then the agreement will be interpreted as creating a covenant rather than a condition."   *Id.*   Texas courts generally construe policies to prevent forfeiture.   *See Underwriters at Lloyds, Syndicate 242 v. Turtle Creek P'ship, Ltd.*, 716 F. Supp. 2d 633, 637 (S.D. Tex. 2010) (citing cases); *Hohenberg Bros.*, 573 S.W.2d at 3 ("Because of their harshness in operation, conditions are not favorites of the law.") (internal citation omitted).

"A covenant, as distinguished from a condition precedent, is an agreement to act or refrain from acting in a certain way."   *Solar Applications Eng'g, Inc. v. T.A. Operating Corp.*, 327 S.W.3d

14

104, 108 (Tex. 2010). "Breach of a covenant may give rise to a cause of action for damages, but does not affect the enforceability of the remaining provisions of the contract unless the breach is a material or total breach." *Id.*

Reading the policy as a whole and giving effect to each of its contractual provisions so none is rendered meaningless, the Court concludes that the "due care and diligence" clause must be read as a covenant, enforceable through subsection 5.c ("Exclusions"), rather than as a condition precedent. *See generally American Mfrs. Mut. Ins. Co. v. Schaefer*, 124 S.W.3d 154, 157 (Tex. 2003) ("When construing the policy's language, we must give effect to all contractual provisions so that none will be rendered meaningless."); *American Int'l Specialty Lines Ins. Co. v. Rentech Steel L.L.C.*, 620 F.3d 558, 562 (5th Cir. 2010) (quoting *Coker*, 650 S.W.2d at 393) ("No single provision taken alone will be given controlling effect; rather, all provisions must be considered with reference to the whole instrument.").

Specifically, the Court agrees with Plaintiffs' argument that "if Section 6.a is considered a condition or warranty, Exclusion 5.c would be rendered meaningless because the policy would never require, and insurers would never invoke, an exclusion if the insured were tasked with proving compliance with a parallel-worded condition." *See* Pl. Brief in Supp. of Mot. for Partial Summ. J. at 15, ECF No. 108; *see also* Pl. Reply at 8, ECF No. 136 ("Travelers' interpretation would force its insurance policy to contain two clauses that operate the same way; the exclusion avoids coverage for violating the due diligence clause and the due diligence 'condition' avoids coverage for violating the due diligence clause[.]"). Further, while the "due care and diligence" clause is under the global heading "Common Conditions," and the first sentence of subsection 6.a contains the words "it is a condition that," "[t]he substance, not the title, determines the nature of [the] policy provision."

15

*Underwriters at Lloyds, Syndicate 242*, 716 F. Supp. 2d at 639 (clause describing itself as a flood warranty and using "as a condition of" language was not a condition precedent or warranty because it did not contain unambiguous warranty/condition language, nor language explicitly stating that coverage will be void if its terms were not complied with).  Further, the "due care and diligence" clause contains no internal provision voiding the insurance for noncompliance with its terms.  While the placement of a voiding clause is not dispositive, it is a factor the Court may consider in interpreting the policy as a whole.  In short, in order that subsection 5.c is not rendered superfluous, the Court concludes that under the plain language of the policy, the "due care and diligence" clause is a covenant, rather than a condition precedent.

Holding in the alternative, the Court agrees with Plaintiffs' argument, pleaded in the alternative, that while no ambiguity is apparent when each subsection (5.c and 6.a) is read in isolation, when read together in the context of the entire policy, an ambiguity arises.  *See, e.g., Atlantic Richfield*, 398 F. Supp. at 716 ("The Paragraph 11 definition of 'blowout' is unambiguous, and the paragraph 1(b) discussion of fire fighting and 'regaining control of the well' is unambiguous.  However, the interaction of these two sections creates acute problems of interpretation.").  In *Atlantic Richfield*, after determining an ambiguity arose when sections of the well control policy were considered together, the court interpreted the ambiguity in favor of the insured and found coverage for a blowout based on the policyholder's reasonable construction of the risk of loss.  *See id.* at 718.  Other than reiterating that the clause is found in the Common Conditions section of the policy and begins with the phrase "[i]t is a condition that," Travelers does not adequately address how subsections 5.c and 6.a can co-exist in the same policy without an ambiguity arising.  *See* Def. Brief in Resp. to Pl. Mot. for Partial Summ. J. at 7, ECF No. 132.  Further, the deposition testimony

of Travelers' corporate representative regarding the interplay of subsections 5.c and 6.a supports

Plaintiffs' position that an ambiguity arises when the two provisions are read together:

> Q.    Why does the policy contain an exclusion [at subsection 5.c] for paragraph
>       6 Due Diligence and Warranties and also have paragraph 6 Due Diligence
>       and Warranties, subsection "a"?  Why are both in the policy?
>
> A.    Because it is a very important part of coverage for Travelers and St. Paul.
>
> Q.    Just because it's important, you state it two different ways?  Is that Travelers'
>       contention?
>
> A.    Well, as a condition, it is a promise that the insured has agreed to adhere to,
>       and if they are in violation of what they promised to do, coverage could be
>       denied as a result of that, and in addition to that it is also an exclusion.

Pl. SJ App. at 715-16.  In this case, both parties cannot simultaneously have the burden of proof on

due care and diligence.  To find otherwise would permit a parallel-worded condition and exclusion

to co-exist in an insurance policy, allowing the policy to be susceptible to two reasonable

interpretations regarding the applicable burden of proof.  No rule of contract construction would

support this outcome.

"When a court finds that an insurance contract is ambiguous, it will adopt the construction

most favorable to the insured."  *Underwriters at Lloyds, Syndicate 242*, 716 F. Supp. 2d at 636

(citation omitted); *Cartusciello v. Allied Life Ins. Co.*, 661 S.W.2d 285, 287 (Tex. App. — Houston

[1st Dist.] 1983, no writ) ("When the language of an insurance policy is susceptible to more than one

construction, the insurance policy should be construed in favor of the insured to avoid exclusion of

coverage.").  The Court concludes that Plaintiffs' construction that the "due care and diligence"

clause is a covenant, enforceable through subsection 5.c ("Exclusions"), is a reasonable construction.

Accordingly, the Court grants Plaintiffs' motion for partial summary judgment on this alternative ground.

In sum, the Court grants Plaintiffs' motion for partial summary judgment on its contention that the "due care and diligence" clause is a covenant, not a condition precedent.  Compliance with that covenant is enforced by Common Conditions, Section I, subsection 5.c (Exclusions), which excludes coverage for breach of the covenant.  Travelers will bear the burden of proving at trial that Plaintiffs failed to exercise "due care and diligence."  *See Fiess*, 392 F.3d at 807 (the insured first bears the burden of proving that a loss is encompassed by the basic coverage terms of the relevant policy; if it is, the insurer may then demonstrate the applicability of an exclusion to coverage).

## ii.        *"Gross Negligence"*

While the Court agrees with Plaintiffs that the disputed clause is not a condition precedent to coverage, the Court rejects Plaintiffs' additional argument that because "due care and diligence" is not defined in the policy, it is ambiguous.  Contending that "due care and diligence" fails to provide an objective standard by which to judge their conduct, Plaintiffs ask the Court to read into the policy a gross negligence standard taken from the JOA.  *See* Pl. Brief in Supp. of Mot. for Partial Summ. J. at 26, ECF No. 108.  In response, Travelers argues that the applicable standard of care is not ambiguous, but is defined by the industry standard governing the conduct of operators in the oil and gas industry, namely, a "reasonable prudent operator" standard.  *See* Def. Resp. to Pl. Mot. for Partial Summ. J. at 9 (and cases cited therein), ECF No. 132.  Travelers further argues that "Eagle's interpretation of due diligence as adopting a 'gross negligence' standard extrinsic to the contract is unreasonable as a matter of law." *Id.* at 15.   Finally, Travelers submits that: "Eagle confuses the reasonable prudent operating standard required of all operators under both industry practice and

18

TRRC regulations with the higher culpability required for liability to its co-venturers." *Id.* at 17. The Court agrees.

Insurance policy terms are not ambiguous merely because they are undefined, but are given their plain, ordinary meaning. *Harken Explor. Co. v. Sphere Drake Ins. PLC*, 261 F.3d 466, 471 (5th Cir. 2001). "Courts [should] strive to honor the parties' agreement and not remake their contract by reading additional provisions into it." *Gilbert Texas Const., L.P. v. Underwriters at Lloyd's London*, 327 S.W.3d 118, 126 (Tex. 2010). An interpretation that requires the court to read additional terms into a policy is not reasonable, and it is error to adopt an unreasonable interpretation of the policy. *Likens v. Hartford Life and Acc. Ins. Co.*, 794 F. Supp. 2d 720, 727 (S.D. Tex. 2011), *aff'd*, 688 F.3d 197 (5th Cir. 2012).

"Contracts are presumed to be made with recognition of industry customs and usages, unless a contrary intent is expressed[.]" *Oil Ins. Ass'n v. Royal Indem. Co.*, 519 S.W.2d 148, 151 (Tex. App.—Houston [14th Dist.], writ ref'd n.r.e.); *see also Gotham Ins. Co. v. Warren E & P, Inc.*, __ S.W.3d __, 2014 WL 1190049, at *4 (Tex. Mar. 2, 2014) (due diligence clause requires an oil and gas operator to "comply with regulations and industry standards" applicable to oilfield operations.).

Pursuant to the JOA, Eagle Oil had the duty "to conduct its activities . . . as a reasonable prudent operator, in a good and workmanlike manner, with due diligence and dispatch, in accordance with good oilfield practice, and in compliance with applicable law and regulation . . . ." Pl. SJ App. at 212. The JOA also contains a specific standard applicable to the operator's liabilities to its co-venturers, as follows: ". . . but in no event shall [Eagle Oil] have any liability as Operator to the other parties for losses sustained or liabilities *incurred except such as may result from gross negligence or willful misconduct*." *Id.* (emphasis added). Texas cases distinguish between an operator's

19

standard of care applicable to drilling operations, and the operator's liability to its co-venturers.
"The exculpatory clause in the JOA establishes a standard of care applicable to drilling operations,
but then provides that, if an operator falls short of this standard, it will not be liable, in the absence
of gross negligence or willful misconduct." *IP Petrol Co. v. Wevanco Energy, L.L.C.*, 116 S.W.3d
888, 894 (Tex. App.—Houston [1st Dist.] 2003, pet. denied).  Plaintiffs seek to insert the "gross
negligence" standard into the policy as the standard by which its conduct should be judged.  The
Court finds that Plaintiffs provide inadequate grounds to replace the reasonable prudent operating
standard required of all operators under both industry practice and TRRC regulations with the higher
culpability required for liability to its co-venturers.[7]

In sum, because it is improper as a matter of law to read the gross negligence standard from
the JOA into the policy, the Court denies Plaintiffs' motion for partial summary judgment on this
issue.  Accordingly, the Court need not reach Plaintiffs' related argument that summary judgment
should be entered in its favor because Travelers has no evidence that Plaintiffs acted in a grossly
negligent manner.  *See* Pl. Brief in Supp. of Mot. for Partial Summ. J. at 26, ECF No. 108
("Plaintiffs ask this Court for partial summary judgment that Travelers has no evidence of gross
negligence or willful misconduct and cannot rely on 'due care and diligence' as a defense to Eagle
Plaintiffs' claims.").  Whether Plaintiffs exercised "due care and diligence" under industry standards
will be an issue for the trier of fact.

---

[7]The Court rejects Plaintiffs' reliance on witness testimony interpreting the meaning of the "due care
and diligence" clause to create an ambiguity, including testimony of their own expert that he does not know
what these terms mean. *See generally CBI Indus., Inc.*, 907 S.W.2d at 520 ("Parol evidence is not admissible
for the purpose of creating an ambiguity."); *Nautilus Ins. Co. v. Nicky & Claire's Day Care, Inc.*, 630 F.
Supp. 2d 727, 734 (W.D. Tex. 2009) ("[A] court must first determine whether the parties' contract is
ambiguous before considering the parties' interpretation  and admitting extraneous evidence.").

2.      **Section IA – Plugging and Abandonment ("P&A") Costs**

Plaintiffs also move for summary judgment on their breach of contract claim based on

Travelers' denial of coverage for their P&A costs.  Coverage for reimbursement of costs to regain

control of a well, including P&A costs, is set forth in Section IA of the policy, which provides:

**SECTION IA – CONTROL OF WELL INSURANCE**

1.      **COVERAGE**

The Company agrees, subject to the Combined Single Limit of Insurance
shown in Item 7.A. of the DECLARATIONS, and other terms and conditions
of this Policy, to reimburse the Insured for *actual costs and expenses
reasonably incurred* by the Insured:

a.      *To regain or attempt to regain control of any "well insured"
which becomes a Well Out Of Control* as defined in Paragraph
2.a. below, including any other "well" that becomes a Well
Out Of Control as a direct result of a "well insured" becoming
a Well Out Of Control, *but only such costs or expenses that
are incurred until the "well" becomes a Well Brought Under
Control as defined in Paragraph 2.b. below*[]. . .

\* \* \*

2.      **DEFINITIONS**

a.      **Well Out Of Control**

For purposes of this Policy, a "well" will be deemed to be a Well Out
Of Control only when there is an unintended flow of drilling fluid,
oil, gas or water above the surface of the ground, or water bottom in
case of a "well" located in water, which cannot be controlled by the
blowout preventer, storm choke, "wellhead equipment" or other
equipment [required in the policy], or when declared by the
appropriate United States, Canada or other governmental regulatory
authority.

\* \* \*

b.      **Well Brought Under Control**

For the purposes of this Policy, a "well" deemed to be a Well Out Of Control in accordance with Paragraph 2.a. above will be deemed to be a Well Brought Under Control at the time that the flow giving rise to a claim under this SECTION IA stops, or is stopped *and*:

> (1) The drilling, deepening or "workover", or other similar operation taking place in the "well" immediately prior to the "occurrence" giving rise to such claim is resumed, or can be resumed;

> (2) The "well" is or can be returned to the same producing, shut-in or other similar status that existed immediately prior to the "occurrence" giving rise to such claim; or

> (3) When the "well" is permanently plugged and abandoned in accordance with procedures approved by the appropriate United States, Canada or other governmental regulatory authority;

> *whichever comes first*[.]

**c.    Costs or Expenses**

Costs or expenses covered under this Policy *includes* costs of materials and supplies required, the services of individuals or firms specializing in controlling "wells" and directional drilling and *similar operations necessary to bring the Well Out Of Control under control* including costs and expenses incurred at the direction of regulatory authorities to bring the Well Out Of Control under control, and other expenses included within Paragraph 1, of this Section 1A.

Pl. SJ App. at 26-27 (emphasis added).

*a.    Summary of the Parties' Arguments*

Plaintiffs move for partial summary judgment on their P&A costs, arguing that the Court can determine as a matter of law that Travelers is liable for costs incurred to bring an out of control well to the defined term of "well brought under control." *See* Pl. Brief in Supp. of Mot. for Partial Summ. J. at 15-16, ECF No. 108.  In support, Plaintiffs contend:

22

> According to the unambiguous, plain reading of the policy, all that is needed for an insured to obtain reimbursement of costs incurred between a "well out of control" and a "well brought under control" by plugging and abandonment is 1) a flow, 2) a flow that has been stopped, and 3) a permanently plugged and abandoned well in accordance with approved governmental procedure.

*Id.* at 36.   While Plaintiffs recognize that the policy also provides that a well would be deemed "under control" at such time as "it is or can be returned to the same producing, shut-in, or other similar status" that existed immediately prior to the "occurrence," Plaintiffs contend that this alternative provision would not be triggered, as the evidence shows the only "reasonable and safe option was to permanently plug and abandon the well."   *Id.* at 36 (and evidence cited therein). According to Plaintiffs: "There are three alternatives for timing of when well control expenses stop and only one is applicable here, the express recognition of costs that are recoverable through the permanent plugging and abandonment of the well." *Id.* at 34.

Travelers opposes the motion, arguing that "[g]enuine issues of fact exist regarding whether the P&A costs qualify for coverage under the policy, and whether the costs were necessary to bring the well under control is a fact question that must be considered by a jury." *See* Def. Resp. to Pl. Mot. for Summ. J. at 26-27, ECF No. 132.   According to Travelers:

> To recover well-control costs under Section IA of the policy, Plaintiffs must establish (1) that the well went out of control, per policy definition, requiring "unintended flow [] above the surface of the ground, [] which cannot be controlled by the blowout preventer [] or other equipment," (2) that they incurred actual costs and expenses to control the well before the well was "brought under control" as defined by the policy, and (3) that the costs and expenses were both "reasonably incurred" and "necessary to bring the well [] under control."

*Id.* at 19-20, ECF No. 132. Travelers also contends that Plaintiffs "ignore the application of paragraph (2) in the 'Well Brought Under Control' definition, which deems a well 'brought under

23

control' at the time it is returned to the 'same[] or similar status that existed immediately prior to the occurrence giving rise to [the] claim." *Id.* at 22.

In reply, Plaintiffs appear to concede that whether P&A costs were reasonable is an issue for trial. *See* Pl. Reply at 18, ECF No. 136 (although noting that they "disagree that the reasonableness of the costs should be an issue," Plaintiffs "understand reasonableness has been made a fact issue and will prove up at trial the reasonableness of each and every one of the hundreds of invoices that make up the coverage claim[.]").  Plaintiffs dispute Travelers' argument, however, that the policy requires an insured to show that the P&A costs are "necessary to bring the well under control." Specifically, Plaintiffs challenge Travelers' interpretation of Section 1A on the following grounds:

> Travelers intentionally leaves material words out of its policy recitation in its response to create the misleading phrase "necessary to bring the well under control," as if that language is a requirement of coverage rather than a description of a non-exclusive, generic set of costs allowable. . . .  Travelers misreads the plain meaning of Section 1A.  First, a plain reading of the policy makes clear that the "necessary to bring the Well Out of Control under control" language describes (and in sentence structure, modifies) the word "operations," making the "necessary" language nothing more than a descriptor of costs.  The plain meaning of this policy language is Travelers is liable for costs incurred in hiring a company such as Wild Well Control to come to the well site and control the well and all operations that fit within bringing an out of control well to the defined term "well brought under control."

*See* Pl. Reply at 15-16, ECF No. 136.

For the reasons that follow, the Court agrees with Plaintiffs that: (1) P&A costs are covered under the policy from the time the well became a "Well Out Of Control" to the time the Well was permanently plugged and abandoned; and (2) the policy does not require an insured to show that P&A costs were "necessary to bring the well under control" in order to trigger coverage.  The only issue remaining for trial is whether the costs were reasonable.

24

>    **b.**    ***Discussion***

Much of Travelers' opposition hinges on the validity of its interpretation of the policy as requiring an insured to show that P&A costs were "necessary to bring the well under control."  As such, the Court first turns to whether the policy requires such a showing.

>    ***i.***    ***"necessary to bring the Well Out Of Control under control"***

To reiterate, the relevant portion of the policy provides at Section IA, subsection 2.c:

> Costs or expenses covered under this Policy *includes* costs of materials and supplies required, the services of individuals or firms specializing in controlling "wells" and directional drilling and *similar operations necessary to bring the Well Out Of Control under control* including costs and expenses incurred at the direction of regulatory authorities to bring the Well Out Of Control under control, and other expenses included within Paragraph 1, of this Section IA.

Pl. SJ App. at 26-27 (emphasis added).

Having considered the parties' arguments and the policy language, the Court agrees with Plaintiffs that Travelers' interpretation of the disputed provision is not supported by a plain reading of the policy.[8]  Unlike Section IA, subsection 1, Coverage, where "reasonably incurred," directly modifies reimbursable "costs and expenses," the clause "necessary to bring the Well Out of Control under control" is in a separate subsection of the policy, which provides a non-exclusive list of costs allowable.  *See* Policy, Section IA, subsection 2.c, Definitions.  Further, the clause "necessary to bring the Well Out of Control under control" modifies the word "operations," and not costs and expenses.  In short, based on a reading of the plain language of the policy, the Court concludes that nothing in Section IA expressly states or implies that costs shall only be reimbursed if the insured can prove the costs were "necessary to bring the well under control[.]" As long as the well cannot

---

[8]The Court also notes that this basis for denial of coverage was not set forth in Travelers' denial of coverage letter and was first raised in response to Plaintiffs' motion.

be returned to drilling or producing status, and the flow is stopped, the well is deemed to be not under control until it is permanently plugged and abandoned. Travelers' argument to the contrary is unsupported. *See* Policy Section IA, subsection 2.b(1)-(3).

### ii.      When Was the "Well Brought Under Control"?

Travelers does not dispute that there was a loss of control at the well, or an unintended and uncontrolled flow above the surface of the ground.   Accordingly, the remaining issue is when the "Well Out Of Control" became a "Well Brought Under Control" (the trigger for when well control expenses are terminated).   Under Section IA, subsection 2.b(1)-(3) of the policy, there are three possible events which may trigger when a "Well Out Of Control" can be deemed a "Well Brought Under Control," and whichever occurs first will be controlling: (1) the resumption of or an ability to resume drilling, deepening or "workover", or other similar operation taking place in the "well" immediately prior to the "occurrence"; (2) the well is or can be returned to the same producing, shut-in, or other similar status that existed immediately prior to the "occurrence"; or (3) the well is permanently plugged and abandoned in accordance with the appropriate governmental standards. *See* Pl. SJ App. at 26-27.  It is undisputed that Section IA, subsection 2.b(1) is inapplicable.  *See* Pl. SJ App. at 684-85.   With regard to Section IA, subsection 2.b(2), Plaintiffs have produced undisputed evidence that the insurer's expert, Sones, concluded there were several factors that prevented Eagle from re-entering or re-completing through the same wellbore.  *See* Pl SJ App. at 287-88.  In addition to Sones's conclusions, Plaintiffs have provided the Court with undisputed deposition testimony that the only viable option was to plug and abandon the well under Section IA, subsection 2.b(3).  *Id.* at 525-532, 586-90, 835-37, 861-65.  Travelers has failed to raise a genuine

issue of material fact that Section IA, subsection 2.b(3) (permanently plugging and abandoning the well) is not the trigger for when well control expenses should be terminated.

Based on the undisputed evidence, the Court grants Plaintiffs' summary judgment as to P&A costs, finding there is no genuine dispute of material fact that Plaintiffs are owed coverage from the time the well became a "Well Out Of Control" to time the Well was permanently plugged and abandoned.  Whether the P&A costs were reasonable is a fact issue for the jury, as the Court has insufficient evidence in the summary judgment record to determine reasonableness.

### 3.      Section 1B - Redrill Coverage/Extra Expense

Plaintiffs also move for summary judgment on their breach of contract claim based on Travelers' denial of coverage for their Section IB redrill claims.  In support, Plaintiffs argue that coverage is owed under "a plain reading of the policy."  Brief in Supp. of Pl. Mot. for Partial Summ J. at 33, ECF No. 108.  Travelers has filed a cross-motion for partial summary judgment on the redrill claims, contending that Plaintiffs "cannot recover their redrill claim as a matter of law . . . [since] the policy pays to redrill a well lost or damaged as a result of uncontrolled flow, and plaintiffs admit the well was not damaged by the uncontrolled flow[.]" Def. Brief in Support of Mot. for Partial Summ. J at 5, ECF No. 114; *see also* Def. Aff. Defenses No. 9, ECF No. 71 ("[t]here is no Section IB Redrill/Extra Expense coverage for redrill expense because the well was lost or damaged as a result of a casing failure and not as a result of a Section IA well control incident.").

Having considered the parties' arguments and based on a plain reading of the contract language, the Court concludes that Travelers' position is unsupported by the policy language.  The relevant provisions of the policy provide as follows:

### SECTION IB – REDRILL/EXTRA EXPENSE

1.      **COVERAGE**

> The Company agrees, subject to the Combined Single Limit of Insurance shown in Item 7.A. of the DECLARATIONS, and other terms and conditions of this Policy, to reimburse the Insured for actual costs and expenses reasonably incurred by the Insured to restore or redrill a "well", or any part of such "well", *which has been lost or otherwise damaged as a result of a "crater" or other "occurrence" that gives rise to a claim which would be recoverable under SECTION IA of this Policy*….

Pl. SJ App. at 27 (emphasis added).

> An "occurrence" is a specifically defined term:

> "Occurrence" means one accident, loss, disaster or casualty or series of accidents, losses, disasters or casualties arising out of one event.

> a.      With respect to windstorms, all tornadoes, cyclones, hurricanes, similar storms and systems of winds of a violent or destructive nature arising out of the same atmospheric disturbance occurring within any period of 72 consecutive hours will be deemed to be one event.

> b.      With respect to earthquake shocks or volcanic eruptions, all earthquake shocks or volcanic eruptions occurring within any period of 72 consecutive hours will be deemed to be one event

*Id.* at 37.

Plaintiffs argue that Section IB covers costs of redrilling a well lost or damaged as a result of an "occurrence" leading up to the uncontrolled flow.  Plaintiffs further argue that the "occurrence" in this claim is the failure of the 7-inch casing in the Well, which ultimately caused the loss of the Well.  Travelers argues it is entitled to summary judgment "because redrill coverage does not apply unless the well was lost or damaged as a result of unintended and uncontrolled flow." Def. Reply at 7, ECF No. 137.

28

It is undisputed that the failure of the 7-inch casing caused the blowout and loss of the Well. Based on a plain reading of the policy language, the Court rejects Travelers' argument that the policy only pays to redrill a well lost or damaged as a result of uncontrolled flow, rather than lost due to pressure operations.  The policy clearly covers costs or expenses to redrill a well which has been lost as a result of an "occurrence" (defined as an accident, loss, disaster or casualty, or series of such arising out of one event, including but not limited to windstorms, tornados, and earthquakes) that gives rise to a claim that would be recoverable under Section IA.  In this case, the "occurrence" is the casing failure.  Travelers' interpretation skips over the word "occurrence," or interprets "well out of control" as synonymous with "occurrence," even though each is already a defined term. Additionally, the case law upon which Travelers relies is not persuasive, as the cases contain different redrill coverages than Section IB of Travelers' policy and do not include a broad definition of "occurrence."  *See* Def. Brief in Supp. of Mot. for Partial Summ. J. at 4-5 (and cases cited therein).

In sum, the Court holds that the plain language of Section IB of the policy covers Plaintiffs' redrill claims. Travelers' argument that redrill coverage does not apply unless the well was lost or damaged as a result of the unintended and uncontrolled flow is not supported by the policy language. Accordingly, the Court grants Plaintiffs' motion for partial summary judgment on the Section IB redrill claims, and denies Travelers' cross-motion for partial summary judgment on the same claims.[9] Whether the redrill costs were reasonable is a fact issue for the jury, as the Court has insufficient evidence in the summary judgment record to determine reasonableness.

---

[9]The Court's finding that Section IB Redrill costs are covered under the policy obviates the need to consider Travelers' alternative argument that Plaintiffs' motion should be denied because Plaintiffs have failed to segregate recoverable from non-recoverable claims.

**C.      Plaintiffs' Motion for Summary Judgment on Affirmative Defenses**

Plaintiffs have moved for summary judgment on Travelers' affirmative defenses 1, 3, 6, 11, 18, 22, 23, 25, 26, 27, 31, 37, 38, and 41. *See* Pl. Br. in Supp. of Mot. for Partial Summ. J. at 47, ECF No. 108.  In its response, Travelers has agreed to voluntarily withdraw affirmative defenses 1, 3, 6, 11, 23, 26, and 38.  *See* Resp. to Pl. Mot. for Partial Summ. J. at 2, ECF No. 131.  Accordingly, the Court will dismiss affirmative defenses 1, 3, 6, 11, 23, 26, and 38.

With regard to affirmative defenses 18, 22, 25, 27, 31, and 37 (which all relate to Plaintiffs' extra-contractual claims), because the Court concludes in the next section of this decision that Plaintiffs' extra-contractual claims fail as a matter of law (*see infra* Part III.D), the Court denies Plaintiffs' motion for summary judgment on these affirmative defenses.

With regard to affirmative defense 41 (mitigation of damages), the Court grants Plaintiffs' motion for summary judgment.  In Texas, the mitigation of damages doctrine requires a plaintiff to exercise reasonable care in minimizing damages. *Formosa Plastics Corp., USA v. Kajima Int'l, Inc.*, 216 S.W.3d 436, 458 (Tex. App.—Corpus Christi 2006, pet. denied).  The duty to mitigate arises in both contract and tort cases.  *Id.* (citation omitted).  "The party asserting failure to mitigate has the burden of proving facts showing lack of mitigation and must also show the amount by which damages were increased by failure to mitigate." *Cotten v. Weatherford Bancshares, Inc.*, 187 S.W.3d 687, 708 (Tex. App.—Fort Worth 2006, pet. denied).  Because failure to mitigate damages is an affirmative defense on which Travelers bears the burden of proof at trial, Plaintiffs may obtain summary judgment by pointing to the absence of evidence on any essential element of failure to mitigate. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23, 325 (1986). If Plaintiffs do so, Travelers must go beyond its pleadings and designate specific facts demonstrating that there is a

genuine issue for trial. *Celotex Corp.*, 477 U.S. at 322-24; *Little v. Liquid Air Corp.*, 37 F.3d 1069, 1075 (5th Cir. 1994). If Travelers fails to do so, summary judgment is mandatory. *Little*, 37 F.3d at 1076.

Having reviewed the evidence, the Court agrees with Plaintiffs that Travelers has failed to produce proof under Fed. R. Civ. P. Rule 56(c) from which a reasonable juror could conclude that Plaintiffs failed to mitigate damage. Specifically, Travelers states that its "failure to mitigate defense goes to the claim for P&A costs and the claim for redrill costs that were denied for all Plaintiffs." *See* Def. Resp. to Pl. Mot. for Partial Summ. J. at 42-43. The evidence produced by Travelers relates to its argument that Plaintiffs must show their P&A costs were "necessary to regain control of the well" to obtain coverage. The Court has already rejected this argument, finding that it is unsupported by the policy language and undisputed facts. *See supra* Part III.B.2. Travelers has provided the Court with no other proof under Rule 56(c) that Plaintiffs failed to mitigate damages.

Accordingly, the Court grants Plaintiffs' motion for summary judgment on affirmative defense 41. *See generally Celotex Corp.*, 477 U.S. at 322-23; *see also Weischel Farm Ltd. P'ship v. JPMorgan Chase Bank*, 2012 WL 1033514, at *12 (N.D. Tex. Mar. 28, 2012) (Lindsay, J.) (holding that, where defendant raised mitigation of damages in response to plaintiff's summary judgment motion but did not submit any summary judgment evidence in support of its defense, no genuine dispute as to any material fact existed in the absence of summary judgment evidence on plaintiff's alleged failure to mitigate).

## IV.    Travelers' Motion for Partial Summary Judgment on Extra-Contractual Claims

Plaintiffs assert claims against Travelers for extra-contractual liability based on the Texas Insurance Code, the DTPA, and the common law duty of good faith and fair dealing. *See* Pl. Third

Am. Compl. ¶¶ 29(a) - 31(b), 34, ECF No. 68.  Plaintiffs also seek exemplary damages and treble damages for statutory violations of the Texas Insurance Code.  *See id.* ¶ 34.  In essence, Plaintiffs allege that Travelers engaged in bad faith and violated the Texas Insurance Code by denying their claims for coverage under the policy without a reasonable basis.

Travelers moves for summary judgment on Plaintiffs' extra-contractual claims arguing that: (1) a reasonable basis exists as a matter of law to deny coverage; (2) the alleged misrepresentations do not qualify because, as a matter of law, they were not misrepresentations, and alternatively, there was no reliance; (3) there is no evidence of independent tort damage caused by the alleged bad faith acts; (4) Plaintiffs are not protected by the DTPA because they are not consumers; and (5) no competent evidence of fraud, malice, or gross negligence exists to support exemplary damages.  *See* Def. Mot. for Partial Summ. J. at 2-3.  The Court first turns to Travelers' motion for summary judgment on Plaintiffs' common law claims for breach of the duty of good faith and fair dealing.

Under Texas law, there is a duty on the part of the insured to deal fairly and in good faith with an insured in the processing and payment of claims.  *Arnold v. Nat'l Cnty. Mut. Fire Ins. Co.*, 725 S.W.2d 165, 167 (Tex. 1987).  To prove breach of a duty of good faith and fair dealing, a plaintiff must show: (1) that the insurer denied or delayed payment of a claim; (2) that the insurer knew or should have known that coverage for the claim was reasonably clear; and (3) that the breach of the duty proximately caused damages independent of the benefits the plaintiff would receive under the insurance contract.  *Lawyers Title Ins. Corp. v. Doubletree Partners, L.P.*, 739 F.3d 848, 869-70 (5th Cir. 2014); *Hamburger v. State Farm Mut. Auto Ins. Co.*, 361 F.3d 875, 880 (5th Cir. 2004).  If Plaintiffs are unable to provide legally sufficient evidence of bad faith to avoid summary judgment concerning this cause of action, their common law and statutory claims under Insurance Code

chapter 541 are subject to summary judgment. *See Higginbotham v. State Farm Mut. Auto Ins. Co.*, 103 F.3d 456, 460 (5th Cir. 1997) (holding that, under Texas law, extra-contractual claims pursuant to the DTPA and Texas Insurance Code require the same predicate for recovery as a bad faith cause of action, and that because the insurer was found not to have acted in bad faith, insured's claims under the DTPA and Insurance Code were also properly dismissed); *Mid-Continent Cas. Co. v. Eland Energy, Inc*, 795 F. Supp. 2d 493 (N.D. Tex. 2011) (Fitzwater, C.J.), *aff'd*, 709 F.3d 515 (5th Cir. 2013) (same).[10]

Travelers argues that Plaintiffs' bad faith claims fail because (1) a reasonable basis existed to deny claim coverage, and Plaintiffs have failed to raise a fact issue to the contrary; and (2) there is no competent summary judgment evidence of independent tort damage caused by the alleged bad faith acts.   Def. Brief in Supp. of Mot. for Partial Summ. J. at 12, ECF No. 114.   In response, Plaintiffs contend that summary judgment should be denied because Travelers' reliance on Sones's opinion to deny Plaintiffs' claims was unreasonable and because delay in deciding redrill coverage forced them to redrill a less productive vertical, instead of horizontal, well.   *See* Pl. Brief in Resp. to Def. Mot. for Partial Summ J. at 11-32, ECF No. 122.

---

[10]"[W]hen the tortious acts underlying the deceptive trade practices/Insurance Code and bad faith claims differ, [a defense to the bad faith claim] does not bar recovery for the [statutory claim] simply because the insurer proved it had a reasonable basis to deny coverage.  For instance, if one sued an insurer contending that it 1) committed a deceptive act by stating that the cost of the policy was $300, and 2) denied a claim in bad faith, the insurer's proving that it had a reasonable basis to deny the claim does not prevent the insured from pursuing recovery for the deceptive act of misrepresenting the policy's cost."  *Mid-Continent Cas. Co. v. Eland Energy, Inc.*, 2009 WL 3074618, at *26 (N.D. Tex. Mar. 30, 2009) (Fitzwater, C.J.) (citation omitted).

The Court first addresses Travelers' argument that it had a reasonable basis to deny claim coverage and whether Plaintiffs have raised a fact issue sufficient to defeat Travelers' summary judgment motion on this ground.

### A.     Did Travelers Have a Reasonable Basis to Deny Coverage?

#### 1.     Legal Standard

"A cause of action for breach of the duty of good faith and fair dealing exists when the insurer has *no reasonable basis* for denying or delaying payment of a claim or when the insurer fails to determine or delays in determining whether there is any reasonable basis for denial." *Higginbotham*, 103 F.3d at 459.  In order to sustain such a claim, the insured must establish the absence of a reasonable basis for denying or delaying payment of the claim, and that the insurer knew, or should have known, that there was no reasonable basis for denying or delaying payment of the claim.  *Aranda v. Ins. Co. of N. Am.*, 748 S.W.2d 210, 213 (Tex. 1988).  The insured must prove that there were no facts before the insurer that, if believed, would justify denial of the claim. *State Farm Lloyds Inc. v. Polasek*, 847 S.W.2d 279, 284-85 (Tex. App.—San Antinio 1992, writ denied).  Insurance carriers have the right to deny questionable claims without being subject to liability for an erroneous denial.  Furthermore, "a bona fide controversy is sufficient reason for failure of an insurer to make a prompt payment of a loss claim[.]" *Higginbotham*, 103 F.3d at 459. "As long as the insurer has a reasonable basis to deny or delay payment of a claim, even if that basis is eventually determined by the fact-finder to be erroneous, the insurer is not liable for the tort of bad faith."  *Mid-Continent Cas. Co. v. Eland Energy, Inc.*, 2009 WL 3074618, at *26 (N.D. Tex. Mar. 30, 2009) (Fitzwater, C.J.) (citing *Lyons v. Millers Cas. Ins. Co. of Tex.*, 866 S.W.2d 597, 600 (Tex. 1993)).

An insurer may reasonably deny a claim based on an expert's opinion, unless the report was not objectively prepared or if the insurer's reliance was unreasonable. *Thompson v. Zurich-American Ins. Co.*, 664 F.3d 62, 66 (5th Cir. 2011). "Whether there is a reasonable basis for denial of a claim must be judged by the facts before the insurer at the time the claim was denied." *Nunn v. State Farm Mut. Automobile Ins. Co.*, 729 F. Supp. 2d 801, 807 (N.D. Tex. 2010) (Fitzwater, C.J.) (quoting *Rep. Ins. Co. v. Stoker*, 903 S.W.2d 338, 340 (Tex. 1995)). It is an "objective determination" involving whether "a reasonable insurer under similar circumstances would have delayed or denied the claimant's benefits." *Id.* (citation omitted). "Texas courts have cautioned that '[c]ourts should be careful to ensure that the bad faith action is reserved for cases of flagrant denial or delay of payment where no reasonable basis existed, and not for mere unreasonable denial or delay.'" *Id.* (quoting *Polasek*, 847 S.W.2d at 287).

An insurer cannot escape liability by failing to investigate a claim so that it can contend that liability was never reasonably clear, and the insurer will breach its duty of good faith and fair dealing by failing to reasonably investigate a claim. *Universe Life Ins. Co. v. Giles*, 950 S.W.2d 48, 56 n.5 (Tex. 1997). An insurer's duty to investigate, however, is limited. *State Farm Fire & Cas. Co. v. Simmons*, 963 S.W.2d 42, 44 (Tex. 1998). "If, after reasonable investigation, the insurer has evidence showing that the insured's claim may be invalid, a bad faith action is not viable." *See King v. State Farm Mut. Auto. Ins. Co.*, 2001 WL 694576, at *2 (N.D. Tex. June 14, 2001) (Fitzwater, J.) (citing *Tucker v. State Farm Fire & Cas. Co.*, 981 F. Supp. 461, 465 (S.D. Tex. 1997)).

### 2.    Summary of the Parties' Arguments

Travelers contends it had a reasonable basis for denying coverage under the policy. The undisputed evidence shows that Travelers denied Plaintiffs' coverage claims for failure to comply

with the "due care and diligence" clause of the policy.  Def. SJ App. at 229.  The undisputed

evidence further shows that in denying coverage under the "due care and diligence" clause, Travelers

relied on the report of petroleum engineer Sones, a licensed, professional petroleum engineer whom

Travelers had retained to review and investigate the cause of the blowout.  *Id.* at 308-10, 318.  After

reviewing the well records and meeting with Eagle Oil's engineers, Sones concluded that Eagle Oil

exceeded industry-standard maximum pressure allowances for casing, and Eagle Oil's own

maximum pressure tolerance for the Well, and failed to follow prudent engineering practices.

According to Sones, overpressurizing caused the casing to burst downhole, and the resulting pressure

ejected the wellhead and top joints of casing from the hole, causing the blowout.  Sones further

concluded that the Well had to be redrilled because of extensive casing damage and that there

appeared to be no damage to the Well caused by the uncontrolled flow.  *Id.* at 320-24, 327, 343-44.

The undisputed evidence also shows that during Sones's meeting with Eagle Oil, Eagle Oil's

engineers took the position that a manufacturing or other defect could have caused the casing to fail.

*Id.* at 22-23, 201-11.  Plaintiffs' counsel thereafter wrote a letter stating that Eagle Oil's engineers

rejected Sones's conclusions, but did not explain the basis for the disagreement.  *Id.* at 356.

Relying on Sones's report, Travelers' July 5, 2012 denial of coverage letter stated in relevant

part:

> Despite the planned limitation of the wellbore pressure, Eagle elected to exert higher
> pressure on the 7-inch casing and it appears that this higher pressure caused the
> failure of the casing and the blowout ensued. . . . Travelers views the repeated
> pressure excursions far in excess of the designed pressure tolerances . . . as a failure
> to exercise due care and diligence in the conduct of the frac job.  For that reason,
> Travelers is denying Eagle's claim.

*Id.* at 229.

In response, Plaintiffs argue that Travelers' reliance on Sones's opinion to deny coverage was unreasonable.  In support, Plaintiffs posit that Travelers could not reasonably rely on Sones's opinion because: (1) the opinion was not in written form; (2) Sones was retained by, and worked with, Travelers' coverage counsel; (3) the claim notes do not reflect the substance of Sones's opinions, creating the impression that Travelers did not really know the basis for the expert opinion when it denied coverage; (4) Plaintiffs' experts disagree with Sones's opinions; (5) Stone had a bias against operators who use certain engineering standard; and (6) Sones ignored critical facts and/or failed to relay facts to Travelers, including that the 7-inch casing at the Well contained higher yield and burst strength values than standard casing and potential backside casing pressure.  *See* Pl. Brief in Resp. to Def. Mot. for Partial Summ J. at 11-23, ECF No. 122.  In further support of the argument that Travelers knew of should have known that it was reasonably clear that Plaintiffs' claims were covered, Plaintiffs argue that Travelers' "use of the damage by frac/casing failure versus damage by flow argument to contend no coverage for redrill or plug and abandonment is patently unreasonable." *Id.* at 23.

### 3.   Discussion

Where the party seeking summary judgment will not have the burden at trial concerning a cause of action, as here, it can meet its summary judgment obligation by pointing the Court to the absence of evidence to support the claim.  *Celotex Corp.*, 477 U.S. at 325.  Once the movant does so, the nonmovant must go beyond the pleadings and designate specific facts showing a genuine issue for trial.  *Little*, 37 F.3d at 1075.  In addition, the nonmovant must produce evidence to establish the existence of each element for which he bears the burden of proof.  *Dunn v. State Farm Fire & Cas. Co.*, 927 F.2d 869, 872 (5th Cir. 1991).  Summary judgment is mandatory where the

nonmoving party fails to meet this burden. *Little*, 37 F.3d at 1076. The nonmovant's failure to adduce proof as to any essential element renders all other facts immaterial. *Celotex Corp.*, 477 U.S. at 323.

Having considered the parties' arguments, applicable law, and following an extensive review of the record evidence, the Court concludes that Plaintiffs have failed to go beyond the pleadings and designate specific facts to raise an issue for trial as to the reasonableness of Travelers' reliance on Sones's opinion to deny coverage under the "due care and diligence" clause.

First, with regard to Sones's report not being in written form, as Travelers correctly argues, no court has even held that an expert's report must be written to be objective and reliable. Rather, courts are concerned with whether the insurer knew or had reason to know that the substance of the opinion was unreasonable or unreliable, or demonstrated bias. *See, e.g., Southland Lloyds Ins. Co. v. Cantu*, 399 S.W.3d 558, 570 (Tex. App —San Antonio 2011, review denied). Further, that Sones was retained as an expert by, or worked with, Travelers' coverage counsel, by itself, does not make his expert opinion any less reliable or thorough, and is not evidence sufficient to raise a fact issue as to an intent by the insurer to obtain an outcome-oriented opinion. *See id.* As to Plaintiffs' suggestion that Travelers did not really know the basis of Sones's expert opinion when it denied their claim, the Court finds the only evidence of record is to the contrary. *See* Def. SJ App. 228 (denial of coverage letter reflecting Sones's opinions); *id.* at 959 (Travelers' claim manager's deposition testimony that Sones's opinions were transmitted to her telephonically); Pl. App. in Resp. to Def. Mot. for Partial Summ. J. ("Pl. Resp. App.") at 253-59 (Travelers' Supp. Ans. to Ints.). While Plaintiffs accuse Sones of bias against operators who use certain engineering standards, no evidence of bias sufficient to raise a fact issue has been produced. In any event, Texas courts do not address

38

this type of bias, but rather in evaluating bias look to the expert's qualifications, methodology and whether the expert has a reputation for reaching a certain conclusion. *See, e.g., State Farm Lloyds v. Nicolau*, 951 S.W.2d 444, 448-49 (Tex. 1997) (out of one hundred reports conducted by the expert concerning foundation damage due to water leaks, only two reports found damage that would contribute to insurer liability); *Thompson*, 664 F.3d at 68-69. Plaintiffs have submitted no evidence of this type of bias.

Following the June 14, 2012, meeting between Sones and Plaintiffs' engineers, on June 27, 2012, Eagle Oil wrote a letter to Travelers asserting "Eagle strongly rejects the conclusions stated by Greg Sones in the June 14 meeting." Def. SJ App. at 356. Plaintiffs have failed to produce any evidence that Eagle Oil thereafter provided the substance or basis for disagreement. The June 27, 2012 letter also states: "[N]ine months is long enough for Travelers to accept or reject this claim, and Travelers must do so as soon as possible." *Id.* Plaintiffs now appear to be arguing that Travelers should have continued to investigate after this letter and collect additional data. Where an insured asserts there has been inadequate investigation of a claim, it must affirmatively establish what additional investigation was normally performed. *See Maynard v. State Farm Lloyds*, 2002 WL 1461923, at *5 (N.D. Tex. July 2, 2002) (Lynn, J.). The summary judgment record is devoid of such evidence. The evidence shows that Sones reviewed all information Plaintiffs made available to him, that he was provided insufficient evidence of a manufacturing defect in the pipe, and that he took into consideration in reaching his conclusions that the pipe at issue was a "high collapse pipe." Pl. Resp. App. at 588-590. In short, Plaintiffs fail to raise a fact issue that Travelers' investigation was inadequate. *See generally Nunn*, 729 F. Supp. 2d at 808 (quoting *Polasek*, 847 S.W.2d at 288) (an insurer does not have "a duty to leave no stone unturned."); *Polasek*, 847 S.W.2d at 288 (noting that

"[e]ven the most thorough investigation must stop somewhere; there is always something else the investigators could have done.").

Further, the fact that Plaintiffs' experts disagreed with Sones regarding whether Eagle Oil exercised due diligence and what were considered proper operating standards is insufficient to establish a bad faith claim. Conflicting expert opinions, by themselves, do not establish that the insurer acted unreasonably in relying on its own expert. *Thompson*, 664 F.3d at 67. The conflict may support an inference that one expert is incorrect in his or her conclusions, but this is not sufficient to support a bad faith claim. *See, e.g., Rappaport v. State Farm Lloyds*, 1999 WL 417923, at *4 (N.D. Tex. June 22, 1999) (Lindsay, J.) (summary judgment granted where arguments regarding insurer's expert "really amount to nothing more than their strong difference of opinion" with the expert); *Transp. Ins. Co. v. Moriel*, 879 S.W.2d 10, 18 (Tex. 1994), *superseded by statute on other grounds*, Tex. Civ. Prac. & Rem. Code § 41.001(11) ("A simple disagreement among experts about whether the cause of the loss is one covered by the policy will not support a judgment of bad faith."); *see also* Def. SJ App. at 366 (deposition testimony of Eagle's engineer, Darrell Lohoefer, who was in charge of the fracturing operation and who testified as Eagle Oil's corporate representative, admitting that disagreement in engineering opinions does not amount to a lack of objectivity).

Finally, that Travelers interpreted the "due care and diligence" clause as a condition precedent, rather than a covenant enforceable by an exclusion, does not give rise to a bad faith claim. *See Tolbert ex rel. Tolbert v. Nat'l Union Fire Ins. Co. of Pittsburgh, Pa.*, 657 F.3d 262, 268 (5th Cir. 2011) (Texas courts "have made clear that a disagreement about the meaning of contractual terms does not give rise" to a bad faith claim.). Evidence of different interpretations of the policy's

40

redrill and P&A provisions are similarly unavailing, but rather fall within the realm of a bona fide dispute over the meaning of contractual terms. *See id.*[11]

In short, the Court holds that on this record a reasonable juror could not find that Travelers denial of coverage was unreasonable. As Plaintiffs have failed to meet their burden as to an essential element of their bad faith claim, summary judgment in Travelers' favor is mandatory. *See Celotex Corp.*, 477 U.S. at 323. Accordingly, Travelers' motion for summary judgment on this claim is granted, and the claims are dismissed. "Plainly put, an insurer will not be faced with a tort suit for challenging a claim of coverage if there was any reasonable basis for denial of that coverage." *Higginbotham*, 103 F.3d at 460 (citation omitted).

Because Plaintiffs have failed to present evidence that establishes a genuine issue of material fact concerning their claim for breach of the duty of good faith and fair dealing, the Court concludes that their Texas Insurance Code section 541 and DTPA claims fail as well. *See Nunn*, 729 F. Supp. 2d at 811 (quoting *Higginbotham*, 103 F.3d at 460) ("Although [claims under the Texas Insurance Code] are individual causes of action which do not depend on each other for support, Texas courts have clearly ruled that these extra-contractual tort claims require the same predicate for recovery as bad faith causes of action in Texas.").[12] Accordingly, Travelers is entitled to summary judgment on

---

[11]The Court also concludes that Plaintiffs' misrepresentation claims are based on their disagreement with Travelers over whether the facts fall within the policy coverage and relate to the interpretation of policy language. These types of "misrepresentations" do not establish evidence of bad faith. *Tolbert ex rel. Tolbert v. Nat'l Union Fire Ins. Co. of Pittsburgh, Pa.*, 657 F.3d 262, 268 (5th Cir. 2011). Further, the summary judgment evidence shows Plaintiffs did not rely on any of these statements and were not misled by them. Def. SJ App. at 308-09, 377-79, 383-84, 401-02. As a matter of law, these statements are not actionable misrepresentations under the Texas Insurance Code, and the Court grants summary judgment in Travelers' favor on this ground. *See generally Texas Mut. Ins. Co. v. Ruttinger*, 381 S.W.3d 430, 446 (Tex. 2010) (statements that do not mislead the insured are not misrepresentations under Texas law).

[12]Because the Court has granted summary judgment in favor of Travelers on Plaintiffs' bad faith claims, Plaintiffs' claims under Texas Insurance Code section 542.003 (unfair claim and settlement practices)

Plaintiffs' causes of action for breach of the common law duty of good faith and fair dealing, violations of sections 541 of the Texas Insurance Code, and violations of section 17.46(b) of the Texas Deceptive Trade Practices Act, as well as Plaintiffs' request for punitive damages.

### B.    Independent Injuries

Alternatively, even were the denial of coverage found to be unreasonable, the Court grants summary judgment in Travelers' favor because Plaintiffs have failed to raise a fact issue that Travelers' actions caused them injuries independent from the unpaid insurance policy proceeds. *See Parkans Int'l LLC v. Zurich Ins. Co.*, 299 F.3d 514, 519 (5th Cir. 2002) ("There can be no recovery for extra-contractual damages for mishandling claims unless the complained of actions or omissions caused injury independent of those that would have resulted from a wrongful denial of policy benefits.") (citing *Provident Am. Ins. Co. v. Casteneda*, 988 S.W.2d 189, 198-99 (Tex. 1988) (claims of Insurance code violations and under DTPA)).

Plaintiffs only allegation of tort damages independent of policy benefits relates to delays in denial of their redrill costs.  In response to Travelers' argument, Plaintiffs contend that summary judgment evidence shows that Travelers' delay in making a coverage decision caused them to drill a vertical replacement well rather than a more profitable horizontal replacement well.  Based on its review of the competent summary judgment evidence, the Court agrees with Travelers that summary judgment is appropriate because there is no causal connection established between the alleged delay in denying redrill coverage and Plaintiffs' inability to redrill the well horizontally.

Undisputed summary judgment evidence establishes Eagle Oil could not drill a vertical well because it could not obtain the leases necessary to drill a horizontal well.  Def. SJ App. at 420-32,

---

must fail as well. *See Nunn*, 729 F. Supp. 2d at 811 (citing *Higginbotham*, 103 F.3d at 460).

435-36, 509.  Plaintiffs have provided the Court with no evidence establishing they had the necessary lease acreage to redrill a horizontal well at any time in 2012.   A June 22, 2012 letter from Eagle Oil to its investors informed the investors that the necessary acreage for a horizontal redrill was unavailable, and recommended redrilling vertically.  *Id.* at 515-18.   Further, Eagle's corporate representative testified that the "delay" did not prevent them from drilling a horizontal well, but Eagle chose to wait until after the denial because they were concerned that a blowout in the redrill well would not be covered:

> Q.    And why would the timing of the denial have prevented you from spudding the well at an earlier date?
>
> A.    It didn't prevent us.
>
> Q.    All right. What other factors prevented you from spudding a horizontal well at an earlier date?
>
> A.    As I stated previously, it would have been–if it was spudded prior to June the 10th, it would have been under the exact same policy. And since we were yet to resolve a significant question under that policy, drilling another well under that same policy, okay, would only cause us more con–would only cause any reasonable person to be more concerned and, so to speak, add additional risk on the drilling of that well because it would be reasonable to question, well, it doesn't look like they may cover you under this original event. Will they cover you under any event that occurs during this well.

*Id.* at 385.   A non-interested party, Comstock Resources (who bought Eagle Oil's assets including the redrilled vertical well), also provided the deposition testimony of its corporate representative that

Travelers' coverage decision was unrelated to the location or timing of the redrill well. *Id.* at 435-36.

Finally, Travelers had no legal duty to decide coverage or advance funds for a redrill claim under Section IB of the policy before the redrill costs were incurred. *See generally Goodrich Operating Co., Inc. v. Burnett & Co., Inc.*, 2006 WL 1118137, at * 3 (S.D. Tex. Apr. 24, 2006) (under indemnity policy that reimburses out-of-pocket costs, no duty owed until expense incurred). Because there can be no bad faith liability for a delayed coverage decision when such decision was not yet owed and was not yet ripe, Plaintiffs' bad faith claims fail as a matter of law.

In short, Plaintiffs have failed to raise a fact issue that any alleged bad faith delay in determining coverage on the redrill claims was a proximate or producing cause of the purported independent injury, inability to drill a horizontal well. Further, even considering the rebuttal affidavit of Eagle Oil President Darrell Lohoefer (*see* Pl. Resp. App. at 738-42, ECF No. 124-4), which Defendants move to strike, there is insufficient evidence of an "unbroken causal connection" between Travelers' actions or omissions with regard to redrill coverage and Plaintiffs' inability to drill a horizontal well. *See AFS/IBEX Fin. Servs.*, 2011 WL 3163605, at *5; *see also Nunn*, 729 F. Supp. 2d at 814. Accordingly, the Court grants Travelers' motion for summary judgment on this ground as well.

## V.     Motion for Summary Judgment of York Risk Services Group, Inc.

Plaintiffs seek damages for common law and statutory bad faith from York under Texas Insurance Code Sections 541 and 542, and related DTPA provisions, in connection with York's loss adjusting services on behalf of Travelers. *See* Pl. Third Am. Compl. ¶¶ 32(a) - 32(b), ECF No. 68. Plaintiffs allege York violated the Texas Insurance Code during its investigation of the claim.

44

York seeks summary judgment on Plaintiffs' claims, arguing that its representations in its October 21, 2011 preliminary report are not actionable under the Texas Insurance Code, there is no evidence of any bad faith, and there is no evidence of injury independent of the insurance benefits. Mot. for Summ J. of York at 2, ECF No. 115. Because the Court agrees that Plaintiffs have failed to bring forth summary judgment evidence sufficient to raise a genuine issue of material fact of an injury independent of the insurance benefits, the Court will grant summary judgment in favor of York.

York is an independent loss adjusting service that was retained by Travelers for the limited purpose of investigating and adjusting the claims. BC Johnson is the division within York that performed the investigation and adjustment. BC Johnson adjusters went to the Well site two days after the blowout, interviewed witnesses, spoke with the insured's engineers, gathered well records and took pictures of the site. Def. SJ App. at 1-39, 538-39, 544-45. On October 21, 2011, York issued a preliminary report, stating: "Based on a preliminary review of the operations conducted, it appears that as a result of the casings parting within the wellbore, the well then experienced a loss of control." *Id.* at 16. As the Cause of Loss, the report provides:

> The cause of the loss remains under investigation at this time. Although it appears that pressures induced during the frac job resulted in the 7 inch and 9 5/8 inch casings parting. We also need to investigate whether the absence of the A Section that would have tied the 9 5/8 inch wellhead to the 13 3/8 inch wellhead was a factor in the cause or severity. We are also reviewing Texas Railroad Commission Rules and Regulations to determine whether the subject well was in compliance or if an exception had been granted in regard to the 13 3/8 inch wellhead. As such, our investigation is ongoing.

*Id.* at 17. Travelers then referred all engineering issues that were identified to licensed, professional engineer Sones, for evaluation. *Id.* at 311-12, 334-35.

45

The Court has reviewed the summary judgment record and finds that Plaintiffs have failed to point to any evidence that York's actions or omissions were the producing or proximate cause of an injury separate from the denial of policy benefits.  There can be no recovery for extra-contractual damages unless the complained of actions or omissions caused injury independent of that which would have resulted from a wrongful denial of policy benefits.  *See Casteneda*, 988 S.W.2d at 198-99.

In this case, the Court does not understand Plaintiffs to claim that any of York's alleged bad faith violations are the producing cause of independent damage separate and apart from the wrongful denial of coverage.[13]  Instead, Plaintiffs appear to be asserting that their claims for coverage would have been accepted and paid by Travelers had York not preliminarily identified the wellhead configuration as potentially not in compliance with TRRC rules.  *See* Def SJ App. at 374-75, 376. Under Plaintiffs' causation theory, B.C. Johnson's identification of the wellhead configuration as a possible issue to be investigated caused Travelers to hire Sones, who then raised a separate issue upon which coverage was ultimately denied, namely, failure of Eagle Oil to comply with industry standards and its own standards regarding pressuring the well.  On this record, the Court concludes that Plaintiffs' extra-contractual claims against York are far too speculative.  Given the intervening event of Sones's report, upon which Travelers based denial of coverage, the Court finds that summary judgment is proper because there is insufficient evidence of an "unbroken causal connection" between York's actions or omissions and the claim that Plaintiffs were denied coverage

---

[13]To the extent Plaintiffs can be heard to assert that York's actions or omissions caused them to have to redrill a vertical well, rather than a more profitable horizontal well, the Court rejects this arguments for the reasons already stated.  *See supra* Part IV.

in bad faith.  *See AFS/IBEX Fin. Servs.*, 2011 WL 3163605, at *5; *see also Nunn*, 729 F. Supp. 2d at 814.

Summary judgment evidence demonstrates that Plaintiffs' damages, if any, arise from Travelers' denial of policy benefits based on Sones's engineering opinion, not from B.C. Johnson's preliminary investigation and report.  In short, Plaintiffs have failed to point the Court to summary judgment evidence sufficient to raise a fact issue that it suffered independent injury outside of contract damages caused by any alleged acts or omissions of York.  Accordingly, the Court grants York's motion for summary judgment on Plaintiffs' extra-contractual claims.

## VI.   Defendants' Motion to Bifurcate Trial of the Extra-Contractual Claims

Travelers and York have filed a motion to bifurcate the trial of Plaintiffs' extra-contractual claims from trial of the coverage claims.  *See* ECF No. 118.  Plaintiffs oppose the motion.  Because the Court has granted Defendants' motion for summary judgment on Plaintiffs' extra-contractual claims, the Court denies the motion as moot.

## VII.   Conclusion

Based on the foregoing, the Court: **grants in part** and **denies in part** Plaintiffs' Motion for Partial Summary Judgment (ECF No. 107); **grants in part** and **denies in part** Motion for Summary Judgment of Travelers Property Casualty Company of America (ECF No. 113); **grants** Motion for Summary Judgment of York Risk Services Group, Inc. (ECF No. 115); **denies as moot** Defendants' Motion to Strike Plaintiffs' Summary Judgment Evidence (ECF No. 127), and Defendants' Second Motion to Strike Plaintiffs' Summary Judgment Evidence (ECF No. 139); and **denies as moot** Defendants' Motion to Bifurcate Trial of the Extra-Contractual Claims (ECF No. 118).

With regard to Plaintiffs' Motion for Partial Summary Judgment, the Court: **grants** Plaintiffs' motion on the breach of contract claims arising from Travelers' denial of coverage on control of well costs (including P&A) (Section 1A), redrill/related expenses (Section 1B), pollution cleanup costs (Section 1C), and care, custody, and control costs (Section 1D); **grants** Plaintiffs' motion insofar as Plaintiffs' contention that the "due care and diligence" clause in the policy is a covenant, rather than a condition precedent; **grants** Plaintiffs' motion as to affirmative defense 41, which is hereby **dismissed**; and **denies** Plaintiffs' motion in all other part.

With regard to Travelers' Motion for Partial Summary Judgment, the Court: **denies** Travelers' cross-motion on Plaintiffs' Section 1B redrill claim and **grants** Travelers' motion for partial summary judgment in all other part.  The Court hereby **dismisses with prejudice** Plaintiffs' causes of action for breach of the common law duty of good faith and fair dealing, violations of section 541 of the Texas Insurance Code, and violations of section 17.46(b) of the Texas Deceptive Trade Practices Act, and request for punitive damages.  Finally, Travelers' affirmative defenses 1, 3, 6, 11, 23, 26, and 38 were voluntarily withdrawn and are hereby **dismissed without prejudice**.

The Court **grants** Motion for Summary Judgment of York Risk Services Group, Inc.  All claims against York are hereby **dismissed with prejudice**.

Having concluded that Plaintiffs have met their burden of proving a loss encompassed by the coverage terms of the policy, the remaining issue for trial is whether Travelers can demonstrate the applicability of an exclusion to coverage arising from the due care and diligence clause.  In the event Travelers cannot show an exclusion to coverage,  remaining for trial is whether Plaintiffs' costs and expenses were reasonable, including costs and expenses: (1) in attempting to regain control of the Well, including plugging and abandonment; (2) in redrilling a replacement well; (3) in cleaning up

48

pollution resulting from the blowout; and (4) in regard to oil field equipment owned by others that was damaged.  Also remaining for trial are Plaintiffs' prompt payment claims under Texas Insurance Code § 542.048.  This trial is set on the Court's four-week docket commencing July 28, 2014.

**SO ORDERED** this **14th day** of **July, 2014.**

Reed O'Connor
**UNITED STATES DISTRICT JUDGE**